**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TARIQ KHAN | Case No.: 1:23-cv-08576-KPF |
| *Plaintiff*, | **FIRST AMENDED COMPLAINT** |
| v. | |
| FOX CORPORATION, FOX NEWS NETWORK, LLC, and JAMES GREGORY HEADEN | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

   Plaintiff, Tariq Khan, by and through his attorneys, The Ottinger Firm, P.C., hereby files this First Amended Complaint against Defendants Fox Corporation and Fox News Network, LLC (collectively "Fox News," "Fox" or "Entity Defendants"), as well as Defendant James Headen ("Individual Defendant"), to allege upon knowledge concerning his own experience, and upon information and belief as to all other matters, as follows:

<u>**PRELIMINARY STATEMENT**</u>

   1. This case is another in a long line of cases chronicling the retaliatory, discriminatory, and xenophobic environment that permeates Fox News and which fosters a toxic workplace where women, workers of color, immigrants, and Muslim workers are verbally violated, harassed, and retaliated against for exercising their rights.  Mr. Khan made numerous complaints to Fox about discriminatory and harassing comments in the workplace and rather than fix the problem, they instead tried to get rid of the complainer – Mr. Khan by repeatedly asking him to leave the company and finally firing him after he refused to leave voluntarily.

2.      As detailed more below, Mr. Khan made an ongoing series of complaints to Fox about discriminatory and offensive comments at work by his supervisor, James Headen.    After hearing Mr. Khan's repeated complaints, Fox on two separate occasions asked Mr. Khan to leave and accept a severance package, but Mr. Khan refused.  Fox promoted the person who was making the offensive and discriminatory comments, Mr. Headen, and punished the person who complained about it, Mr. Khan.  Finally, after Mr. Khan refused to accept the various severance offers, Fox just fired him and made their third and final severance offer which Mr. Khan again rejected and now he brings this retaliation case against Fox and Mr. Headen.

3.      Plaintiff Tariq Khan, a dedicated and hardworking former Senior Foreign Desk Assignment Editor/Weekend Manager and resident Academy Awards expert for Fox News, endured an extremely hostile work environment and retaliation perpetuated by Individual Defendant, Mr. James Gregory Headen. Instead of remedying the situation, Fox News aided and abetted Mr. Headen's retaliatory harassment by repeatedly ignoring Mr. Khan's complaints, thereby fostering an atmosphere where retaliation, bigotry and hostility ran rampant and was encouraged by the highest levels of management. Ultimately, instead of disciplining Mr. Headen, Fox chose to retaliate against Mr. Khan and terminate his employment for having the audacity to object to Mr. Headen's atrocious behavior.

4.      Mr. Headen, who served as Foreign Desk Manager and was Mr. Khan's immediate supervisor, frequently used racist, misogynistic, and homophobic language in the workplace. For example, Mr. Headen frequently used the terms "bitch," "douche bag," "cocksucker," and "cunt," among other shocking, profane, and discriminatory terms. Other instances of Mr. Headen's foul language and conduct directed at coworkers include, but are not limited to:

- On May 22, 2017, Mr. Headen referred to a colleague as a "fucker" and a "dick."

- Mr. Headen described someone as a "son of a bitch" and referred to a female colleague as a "stupid cunt."

- On one occasion, Mr. Headen berated a female coworker until she cried.

5.     Mr. Headen also expressed racist views on multiple occasions. For example, he repeatedly demonstrated prejudice towards Muslim people and made a handful of remarks at work associating Islam with terrorism in the presence of Mr. Khan, who practices Islam. For instance, in November of 2015 after the coordinated terrorist attacks in Paris, Mr. Headen made an offensive comment that the attacks were "par for the course for Islamic state motherfuckers." Moreover, in March of 2016, Mr. Headen commented in the Newsroom that "motherfucking Muslim terrorists" were to blame for the terrorist attacks in Brussels. As a Muslim, Mr. Khan was uncomfortable with Mr. Headen's clear association of terrorism with all Muslim individuals, particularly Muslim men.

6.     Mr. Khan first reported his concerns about Individual Defendant's frequent use of profanity to Human Resources in December of 2016. Unfortunately, but unsurprisingly, Fox ignored Mr. Khan's complaints. Mr. Khan followed up with HR on January 16, 2017, informing Fox that Mr. Headen's use of foul and sexist language at the News Desk had worsened and that many of his coworkers found his recent use of the word "douchebag" to be extremely unprofessional and offensive. Again, Fox ignored Mr. Khan and failed to address his concerns. Mr. Khan's complaints remained unaddressed until March of 2017, when Ms. Denise Collins from HR assured him that his grievances had been reported and instructed Mr. Khan to inform her if Mr. Headen continued to use inappropriate language in the following weeks.

7.     Unfortunately, conditions in the Fox Newsroom did not improve. When Mr. Headen continued to use extremely unprofessional and offensive language, Mr. Khan requested that Fox change his schedule to avoid working with Mr. Headen. Fox ignored his request. In April

2017, Mr. Khan spoke with the Executive Vice President of HR, Mr. Kevin Lord, who assured him that Fox has a zero-tolerance policy for excessive profanity and offensive language. Mr. Lord told Mr. Khan that he would speak to Mr. Headen about his frequent use of foul and demeaning language.

8.      On May 22, 2017, Mr. Headen referred to a colleague as a "fucker" and a "dick" and Mr. Khan informed Ms. Marsheila Hayes, Director, Campus and Diversity Outreach, on June 1, 2017, of this incident (along with other instances of excessive profanity at work). Ms. Hayes replied on June 2, 2017, assuring Mr. Khan that he "[does have] the right to work in an environment that is free of excessive profanity." She also promised that a company-wide memo would be disseminated that specifically states that employees should "refrain from profanity and descriptors that refer to personal attributes such as race, color, national origin, gender, age, religion, sexual orientation, or disability." The memo also stated that, "At work, certain comments, even if they are meant as a joke, could be perceived as harassment, so do not make such comments."

9.      Mr. Headen's language temporarily improved, as did his working relationship with Mr. Khan. But in 2018, Mr. Headen learned that Mr. Khan was the individual who had complained about his offensive language to Human Resources. As Mr. Khan left work that day, Mr. Headen followed him out of the building and confronted Mr. Khan about his complaints to Mr. Lord, revealing that Mr. Lord had forwarded Mr. Khan's email complaint.

10.      By March of 2020, Mr. Headen resumed his habit of frequently using offensive and profane language. The next month, Mr. Khan requested another meeting with Ms. Collins and Ms. Marsheila Hayes, Vice President of Outreach and Diversity. Again, instead of adequately addressing Mr. Khan's concerns, Fox simply told him that there was nothing more they could do to improve the situation. Shockingly, Ms. Hayes told Mr. Khan that he should accept the fact that

some people need to use profanity to deal with work pressures.

11.     In August of 2020, Mr. Khan contacted Mr. Lord to provide an update on the situation. He explained what he had been told by Ms. Collins and Ms. Hayes. But he asked Mr. Lord about the use of certain sexist slurs that were particularly offensive to women, providing examples of such words that were recently used by Mr. Headen, including "bitch" and "cunt." Mr. Lord did not respond.

12.     After receiving no response from Mr. Lord, Mr. Khan followed up again on October 16, 2020, to complain and express concerns specifically about Mr. Headen. Mr. Khan, cognizant of Fox's reputation for retaliating against employees who file complaints against executives for hostile behavior, also wrote that, "I fear that the underlying tensions will eventually lead to more issues (including my complaints of retaliation) like we've had in the past." He asked Mr. Lord to assign him to a different supervisor because he could no longer tolerate working for a manager who used terms like "bitch," "cunt," "motherfucker," "cocksucker," "son of a bitch," and "douchebag" to describe people he does not like. Mr. Khan explained that he felt that such an individual had no credibility when it came to evaluating his job performance.

13.     Fox's Vice President of Employee Relations, Ms. Anna Druker, eventually contacted Mr. Khan in November of 2020. Mr. Khan told her about Mr. Headen's offensive language and the retaliation that Mr. Khan experienced after reporting Mr. Headen's behavior. He also disclosed to Ms. Druker that Mr. Headen had previously used language hostile to Muslim individuals. Ms. Druker conducted an investigation and later told Mr. Khan that Fox had not found Mr. Headen's offensive language to be excessive and found no evidence of retaliation. She also informed Mr. Khan that his request for a different immediate supervisor had been denied. When Mr. Khan informed Ms. Druker that Mr. Headen had stopped speaking to him and that there were

now serious tensions between the two of them, Ms. Druker suggested arranging a severance package for Mr. Khan and that he leave the company (in lieu of properly addressing his complaints).

14.     On April 29, 2021, Jay Wallace, President and Executive Editor of Fox News Media announced the promotion of Headen to Vice President of News Coverage despite receiving years of complaints about his abhorrent workplace behavior.

15.     In March of 2022, Ms. Denise Collins from HR reached out to Mr. Khan to ask him to meet with an attorney regarding an undergoing investigation into the News Department, and Mr. Headen in particular. Certain female employees had filed complaints about Mr. Headen and his treatment of women. Mr. Khan spoke with the attorney about Mr. Headen's previous inappropriate behavior towards women, including an incident where he berated a female coworker. The attorney also asked Mr. Khan if he had heard Mr. Headen use words like 'douchebag' and 'motherfucker' - and Khan confirmed that he had on numerous occasions. Mr. Khan also informed the attorney that Mr. Headen had not spoken to Mr. Khan in over a year. The attorney acknowledged that Mr. Headen's behavior was stressful for Mr. Khan.

16.     Rather than taking steps to remove or reassign Mr. Headen, or correct his offensive behavior, Fox News offered Mr. Khan a severance package to leave the company in March of 2022. Mr. Khan declined due to his passion for the job.

17.     In the months that followed, Mr. Khan made every attempt to mend his relationship with Mr. Headen. He never spoke negatively about Mr. Headen to any of his colleagues and treated Mr. Headen with respect and civility. However, this only made the situation worse. Mr. Headen seemingly resented Mr. Khan's attempts to establish peace between the two of them and expressed his anger towards Mr. Khan during their interactions.  Not only did he continue to ignore Mr.

Khan, but he became visibly angry and made faces at Mr. Khan every time he was in his presence. Mr. Headen also gave Mr. Khan dirty and threatening looks every time Mr. Khan greeted him in the hallways, the kitchen, or other common areas.

18.     Later that year on December 19, 2022, Mr. Khan called the Fox Alert Line and explained that Mr. Headen had created a retaliatory hostile work environment by his continued mistreatment of Mr. Khan and had continued his usage of sexist and racist language. He also raised a concern that Mr. Headen was treating him in such a hostile manner because he was Muslim, given Mr. Headen's past discriminatory remarks towards Muslims. For example, Mr. Khan explained that Mr. Headen would bring in hot bacon into the newsroom knowing that the smell bothered Mr. Khan as a Muslim who does not eat pork and ignored Mr. Khan's request to step away to avoid the smell. Ms. Druker subsequently informed Mr. Khan that she would speak with Mr. Headen about Mr. Khan's concerns and assured him that Mr. Headen could not retaliate in response, though, as explained below, this was not the case.

19.     On January 12, 2023, Mr. Khan spoke to Ms. Druker again who had previously suggested that he leave the company after hearing his complaints.   Ms. Drucker told Mr. Khan that neither Fox nor Headen had done anything wrong.   She said that an investigation had cleared the company and Headen of any wrongdoing.  Mr. Khan challenged these findings and repeated his complaints about Headen's retaliatory and discriminatory conduct but it was clear that Fox was dismissing his concerns.

20.     Fox then began plotting to find a way to get rid of Mr. Khan and his complaints. Fox had already twice tried to get rid of him by offering him severance packages, but he refused. Finally, they had enough and would offer him a third severance package but this time they would terminate his employment.   Fox presented the third and final severance package to Mr. Khan on

May 19, 2023 along with notice that his employment was terminated effective immediately.

21.     Upon information and belief, Fox and/or Headen made the retaliatory decision to terminate Mr. Khan well before his actual date of termination.

22.     By terminating Mr. Khan in this unjustified manner, Fox News sent a clear message to victims of discrimination and harassment – *speak out and you are out*.

23.     Mr. Khan brings this case to obtain vindication for Mr. Headen and Fox News's flagrant violations of his rights under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e - 2000e17 (as amended) and the New York City Human Rights Law[1], Admin. Code §§ 8-107, *et seq.* ("NYCHRL").

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 216(b) and 1331 as this case is brought under the Federal Civil Rights Act of 1964. The Court has supplemental jurisdiction over Plaintiff's city law claim as this claim is so related to the other claims in this action that they form part of the same case or controversy under Article III of the United States Constitution.

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside in New York, New York, and a substantial part of the events or omissions giving rise to the claims herein occurred in this district.

## ADMINISTRATIVE REQUIREMENTS

26.     All conditions precedent to filing claims under Title VII have been performed or have occurred. On May 30, 2023, Plaintiff filed a complaint with the New York State Division of

---

[1] In June 2021, Fox News paid a $1 million fine to the New York City Human Rights Commission to settle claims of widespread sexual misconduct, the highest fine ever ordered by the Commission for violations of the New York City Human Rights Law.

Human Rights ("Division") and the U.S. Equal Employment Opportunity Commission ("EEOC") in connection with his claims of retaliation as alleged herein.

27.    On August 2, 2023, the Division issued Mr. Khan a Determination and Order of Dismissal for Administrative Convenience, and on September 21, 2023, the EEOC issued a Dismissal and Notice of Rights letter.

28.    This case is brought within 90 days of receipt of the EEOC notice on September 21, 2023.

29.    Plaintiff has fully exhausted his administrative remedies and is entitled to file in the district court. This Amended Complaint is filed within the appropriate time.

## THE PARTIES

30.    Plaintiff Tariq Khan is an adult resident of New York County, New York, who was previously employed by Defendant Fox News Network LLC.

31.    Defendant Fox Corporation is a corporation formed under Delaware law and headquartered in New York, New York. Fox Corporation is a publicly traded corporation listed on the Nasdaq stock exchange and is the parent company of Defendant Fox News Network LLC, which comprises most of its profits.

32.    Defendant Fox News Network LLC is widely regarded as one of the most powerful and far-reaching news organizations in the world. Fox News Network LLC operates, among other things, the Fox News Channel, a 24-hour cable news station reaching about 90 million U.S. homes. Fox News averages over three million viewers during its primetime evening news programs and nearly two million daytime viewers. Fox News Network LLC is a limited liability company organized under the laws of Delaware, with a principal place of business in New York, New York.

33.    For ease of reference, unless stated otherwise, the two Entity Defendants are

collectively referred to herein as "Fox" or "Fox News."

34.     While not currently named as defendants herein, the Chief Executive Officer ("CEO") of Fox Corporation, Lachlan Murdoch, and the CEO of Fox News Network LLC, Suzanne Scott, may become named defendants based upon discovery yet to be adduced in this action concerning their involvement with respect to Plaintiff's claims and the corporate and economic relationships between the two Entity Defendants. It stands to reason that because of the overwhelming importance of Fox News Network LLC's results (i.e., 95% of Fox Corporation's profits), Lachlan Murdoch plays a direct role in the management of Fox News Network LLC. On information and belief, all important hiring and firing decisions and all internal significant personnel-related investigations at Fox News are vetted by him, and no decisions, including whether to protect senior Fox News talent, retaliate against victims or opponents of sexual, racial and religious-based harassment, or encourage, condone, and/or abet harassment by senior Fox News executives, can be made without his approval in collaboration with Ms. Scott.

35.     Moreover, as the CEO of Fox Corporation, Lachlan Murdoch is required to provide certifications under the Sarbanes-Oxley Act as to the truthfulness of the company's financial disclosures, which must address the company's sexual harassment and misconduct lawsuits.[2] To be able to certify these documents, Lachlan Murdoch is required to regularly communicate with Fox News's operational team, including Ms. Scott, and Fox News's auditors and attorneys, and to ensure that complaints from local agencies such as the New York City Human Rights Commission ("NYCHRC") and New York State Division of Human Rights ("NYSDHR") lead to the strengthening of Fox News's internal controls in place to investigate, prevent, and remedy

---

[2] *See* United States Securities and Exchange Commission, Form 10-K, Fox Corporation *available at* https://investor.foxcorporation.com/static-files/4a0946e4-0d3a-4c8e-921b-0ed5cefd5145, at 93 (disclosing race-based litigation and investigations).

significant reputational risks resulting from Fox News's tolerance and condoning of sexual, racial harassment and religious-based discrimination or retaliation. In this context, Lachlan Murdoch, along with Ms. Scott, likely bear ultimate corporate responsibility for the negligent supervision and retention of personalities with a known propensity to create a hostile working environment for the women, Muslims and people of color of Fox News.

36.     Defendant James Gregory Headen is the Vice President, News Coverage at Fox. At all relevant times, Mr. Headen has been an agent of Fox News, and has had authority to make decisions impacting Mr. Khan's employment. Upon information and belief, Defendant Mr. Headen is a resident of the State of New York.

## STATEMENT OF FACTS

### I.  There is a Culture of Sexism, Racism, Religious Intolerance and Retaliation Entrenched at Fox News That Has Led to the Harassment and Silencing of Employees

37.     The information set forth in this section is alleged upon information and belief and based on reports from reputable news agencies and recently filed lawsuits against Fox News.

38.     Fox News has a well-documented and notorious reputation for sexism, racism and religious bigotry. Fox News has persistently run rampant with blatant sexism, racial harassment and religious discrimination –realities that have become deeply stitched into the fabric of Fox News's workplace culture — that permeates the airwaves, with little to no remediation.

39.     Fox News has given a platform to on-air personalities that espouse harmful rhetoric and conspiracy theories about racial and religious minorities, as well as immigrants. For instance, in 2019, Fox News host Jeanine Pirro insinuated that a Muslim congresswoman "[adhered] to Shariah law, which is antithetical to the United States Constitution." Her comments were widely condemned.

40.     Behind the scenes, Fox executives echo such bigotry by deriding marginalized people and fostering a toxic work environment where racism, sexism, homophobia, xenophobia, Islamophobia, and Antisemitism are normalized. Any who dare speak up and complain about unfair treatment are ignored and/or retaliated against.

41.     The prevalence and acceptance of sexual harassment against women at Fox is widely recognized. After approximately two dozen female employees at Fox News accused Mr. Roger Ailes, former CEO of Fox News, of sexual harassment and/or retaliation, Mr. Ailes was forced to resign. However, in former Fox Corporation's CEO Rupert Murdoch's public statement regarding Mr. Ailes's resignation, he thanked Mr. Ailes for his "remarkable contribution" to the network, disregarding the pain and suffering he caused his many victims. Indeed, Mr. Ailes allegedly received $40 million from Fox News in connection with his departure and remained a consultant until his passing in 2017. Thereafter, rather than clean house, Mr. Murdoch retained Mr. Ailes's two most loyal lieutenants – Bill Shine and Suzanne Scott – who actively condoned, perpetuated, and covered up the rampant incidents of sexual harassment and sexual assault at Fox News.

42.     **October 2017:** Ms. Megyn Kelly publicly declared that Fox News executives continued to retaliate against women for reporting sexual harassment and discrimination.

43.     **November 2017:** 21st Century Fox reached a $90 million dollar settlement in a shareholder derivative action arising from claims that the company had allowed pervasive racial and sexual harassment in the workplace, which resulted in reputational and financial harm to the corporation.

44.     **December 2017:** Mr. Rupert Murdoch, former Chairman and CEO of Fox Corporation casually dismissed all sexual harassment allegations at Fox News as "nonsense. . .

[and] largely political because we are conservative," even though many of the female victims also identified as politically conservative. Mr. Murdoch also claimed that the allegations against Mr. Ailes were "isolated incidents" and that "there has been nothing else" since his ouster. Contemporaneously, approximately ten former and current Fox News employees told The Huffington Post that Mr. Murdoch's comment was a blatant lie: "I have had to put up with a hostile work environment for years, and now I'm told that it doesn't exist by a man who doesn't have to walk these halls every day?"

45.     **2018:** Fox News paid approximately $10 million in settlements with 18 former employees. The cases primarily involved allegations of racial discrimination against the network, along with several gender bias and retaliation claims. Here are some examples of these allegations:

    a)     Eleven current and former Fox employees filed a class action lawsuit alleging racial discrimination and a hostile work environment. The class action lawsuit accused the network's chief attorney, Dianne Brandi, of ignoring repeated complaints regarding the former comptroller Judith Slater's racist statements and racial discrimination. According to the suit, Ms. Slater mocked Black employees in her department for the way they spoke and often used unflattering stereotypes about Black people in office conversations. Ms. Denise Collins was also accused of inaction despite awareness of several instances of racial discrimination at the network. Ms. Brandi and Ms. Collins allegedly told Black employees that "nothing could be done because Slater knew too much about senior executives," including the disgraced Roger E. Ailes and Bill O'Reilly.

    b)     Kelly Wright, a Black former anchor and reporter for Fox, filed a lawsuit alleging that he faced racial bias and was denied opportunities for

promotion based upon his race. He also alleged that he was asked by Fox to act in a racially demeaning manner by portraying stereotypical Jim Crow characters on air. Finally, Mr. Wright alleged that he was terminated in retaliation for complaining about Ms. Slater's discriminatory behavior.

c)      Another former Fox News employee, a Hispanic woman named Adasa Blanco, filed a separate racial discrimination lawsuit against Fox, Ms. Slater, and Ms. Brandi. She alleged that she notified Fox executives of Ms. Slater's racist conduct, including calling Black men "women-beaters," mocking stereotypical accents, and making repeated derogatory jokes about people of Chinese, Mexican, and Indian descent, over an eight-year period before Fox chose to terminate her.

d)      Naima Farrow, who is Black, sued for pregnancy discrimination. She also alleged that Ms. Slater would mock her in a demeaning manner because of her race.

46.      **March 2019:** an audio clip of Fox political commentator Mr. Tucker Carlson emerged in which he defended statutory rape. Dan Gallo, a Fox News Producer subsequently complained to Mr. Kevin Lord, Executive Vice President and Chief Human Resources Officer, about the recordings of Mr. Carlson defending statutory rape because he believed such vitriol created an unsafe workplace for female employees. Reportedly, Mr. Gallo was later confronted by Mr. Carlson and bullied into not pressing the matter further. Indeed, no further investigation was conducted regarding Mr. Carlson's remarkably disturbing comments, nor did Fox News issue any public statement.

47.      **August 2019:**  Days after a 21-year-old white man killed 22 people at an El Paso, Texas Walmart to "protest" what he called the "Hispanic invasion of Texas," Mr. Carlson declared

on the air that white supremacy was largely a "hoax." In response, Ms. Cristina Corbin, a Fox News Producer, tweeted an indirect rejoinder to the prime-time star: "White supremacy is real, as evidenced by fact." Several hours later, Mr. Carlson reportedly called Ms. Corbin from a blocked number and told her in front of her coworkers to: "Shut your mouth."

48.    **December 2019:** Ms. Brittany McHenry filed a lawsuit alleging sexual harassment against her Co-Host, Mr. George Murdoch (no relation to Rupert Murdoch), after he threatened to send her a "dick pic" over a text message and told her he liked her buttocks and legs, speculating about what it would be like to have sex with Ms. McHenry. Ms. McHenry alleged that she complained numerous times to Fox News HR and management about this violating conduct, but no investigation of her claims ever took place, and instead, she was excluded from work-related events and ultimately blacklisted from appearing on Fox News. Reportedly, Ms. Monica Mekeel from HR asked Ms. McHenry what she had done to "provoke" George Murdoch as part of her subsequent "investigation." Fox News eventually closed its investigation and concluded that George Murdoch's conduct did not constitute sexual harassment because there was no "clear intent to have sex" with Ms. McHenry.

49.    **July 2020:** Mr. Blake Neff, a senior Writer for TCT, resigned after several racist and sexist comments that he posted on AutoAdmit (a message board notorious for vulgar and offensive content) under the pseudonym "CharlesXII" came to light. Mr. Neff had allegedly been posting brazenly sexist and racist comments for years, including a lengthy thread mocking a woman with whom he was "friends" on Facebook as an "Azn mega-shrew," which led other users on the message board to abuse the woman for years with nearly 1,000 derogatory follow-up posts. Mr. Carlson still called Mr. Neff a "wonderful writer" in an appearance on The Five.

50.     While Ms. Suzanne Scott publicly condemned the "horrific racist, misogynistic and homophobic behavior," claimed "actions such as his cannot and will not be tolerated at any time in any part of our work force," and said that "Tucker will be addressing this on his show," Lachlan Murdoch approved Mr. Carlson's defensive remarks, which including the following statement: "we should also point out to the ghouls now beating their chests and triumph of the destruction of a young man that self-righteousness also has its costs." Notably, Mr. Carlson never acknowledged the nature of Mr. Neff's racist and sexist online comments, nor did he explain that Mr. Neff had been making such posts up until a week prior to when his horrific conduct came to light.

51.     **June 2021:** Fox News paid a $1 million fine to the New York City Human Rights Commission to settle claims of widespread sexual misconduct, the highest fine ever ordered by the Commission for violations of the New York City Human Rights Law. The settlement required Fox News to not enforce mandatory arbitration clauses related to New York City Human Rights Law claims against its employees for four years, provide Commission-approved harassment and bystander training, and implement (for at least two years) a policy and complaint procedure for reporting discrimination and harassment complaints with multiple levels of review. According to the NYCHRC's press release, "any further violations that occur during this period will be considered succeeding violations and additional penalties will be assessed accordingly."

52.     **June 2022:** Fox News reportedly paid $15 million to settle allegations of pay disparity based on gender by former host Melissa Francis, who was allegedly fired after she raised concerns.

53.     **March 2023:** a former Fox News producer named Ms. Abby Grossberg (who is Jewish) filed a lawsuit against Fox for religious discrimination, along with gender discrimination and pay equity violations. Ms. Grossberg claimed that she was subjected to anti-Semitic

16

harassment during her time at Fox.

54.     As evidenced by the above, there is a widespread pattern and practice at Fox News of supporting its executives who display discriminatory behavior. Thus, it is no wonder that Mr. Khan's harasser felt emboldened to mistreat him with impunity.

**II. Mr. Khan is Hired by Fox News and is an Exemplary Employee**

55.     Mr. Khan began his employment with Fox as a Foreign Desk Assignment Editor for the Fox News Channel in 2008. He was responsible for coordinating international news coverage, monitoring and responding to breaking international news, researching international news stories and subjects, working with overseas bureaus and personnel, coordinating international live shots, and working with the network's editorial and production teams on all international news requests. Mr. Khan was also Fox's resident film and Academy Awards expert and appeared on-air to discuss his Oscar predictions.

56.     Mr. Khan excelled in his role, enjoyed his job at Fox News, and worked well overall with his colleagues (with the exception of Mr. Headen). He received consistently exceptional performance evaluations, and Fox awarded him with substantial salary increases each year based on his excellent performance. In 2015, Fox News promoted Mr. Khan, and his new title became Senior Assignment Editor/Weekend Manager of Foreign Desk.

57.     Mr. Khan was an exceptionally dedicated and reliable employee. He worked both weekend days at Fox for nearly 15 years. He went 14 years straight without ever calling out sick on a weekend day. His perfect streak was only broken last year when he finally contracted COVID-19 and had no choice but to call out. Mr. Khan worked virtually every holiday and usually did a double shift on Christmas Day so that his colleagues could spend the holiday with their families. Mr. Khan consistently went above and beyond to help his team. He always offered to assist his

coworkers on the Fox National Desk, and even managed both Desks on several occasions when the department was short-staffed. He did that most recently on Christmas Day 2022, when a colleague was out sick with COVID and there was no one available to cover the shift. Mr. Khan had a double workload that day, but he did not complain about it. He did not ask for and did not receive anything in return for his extra efforts. He did it because he wanted to be the best employee possible. Mr. Khan had also earned a stellar reputation at the company for his positive attitude, his unfailing politeness, and the kindness that he showed to all of his Fox News colleagues. Many of them openly stated that Mr. Khan was "the nicest person in the newsroom."

58.     From 2008 through 2015, Mr. Khan worked well with everyone in his department, and he felt valued. This all changed in April 2015 when Mr. Headen became the Foreign Desk Manager and Mr. Khan's new immediate supervisor.

**III. Mr. Khan Experiences and Observes Discrimination in the Workplace**

59.     In April 2015, Mr. Headen became Mr. Khan's immediate supervisor. Mr. Headen's first task in his new role was to riddle the workplace with profanity, as well as Islamophobic, racist, homophobic, and sexist remarks.

60.     Mr. Headen frequently utilized profanity in a hostile and unprofessional manner at work. Fox's harassment and discrimination policy stipulates that excessive profanity could be considered workplace harassment. Mr. Khan was deeply perturbed by Mr. Headen's rancor and unprofessionalism.

61.     In particular, Mr. Headen frequently used sexist and homophobic terms and slurs in the workplace, including "bitch," "douche bag, "cocksucker," and "cunt," among others. He referred to one female colleague as a "stupid cunt." Mr. Headen also expressed racist views on multiple occasions. For example, in 2015, he complained to Mr. Khan that the waiter at a restaurant he visited was slow because he was Black.

62.     Mr. Headen also demonstrated prejudice towards Muslim people and made a handful of remarks at work associating Islam with terrorism. For instance, in November of 2015 after the coordinated terrorist attacks in Paris, Mr. Headen made an offensive comment that the attacks were "par for the course for Islamic state motherfuckers." Moreover, in March of 2016, Mr. Headen commented in the Newsroom that "motherfucking Muslim terrorists" were to blame for the terrorist attacks in Brussels. As a Muslim, Mr. Khan was uncomfortable with Mr. Headen's clear association of terrorism with all Muslim individuals, particularly Muslim men.

63.     Mr. Headen was aware of Mr. Khan's religious beliefs and nevertheless made these offensive comments in his presence. Mr. Khan does not drink alcohol or eat pork and worked on Christmas because he does not celebrate it. Mr. Headen was aware that Mr. Khan is ethnically Pakistani and that he speaks Urdu. Despite knowing about Mr. Khan's beliefs and national origin, Mr. Headen made pointed remarks about Muslim people in the workplace.

**IV. Mr. Khan Reports Mr. Headen for Discriminatory Language and is Ignored**

64.     On December 9, 2016, Mr. Khan could no longer tolerate Mr. Headen's frequent use of offensive language and reported his concerns to Human Resources. He wrote to Ms. Collins, "While I understand that some people may use these words freely in their own homes or amongst friends, many of us find this language both inappropriate and offensive…We can't help but feel that we shouldn't be forced to listen to such language in the work environment." He urged Ms. Collins to address the concerns of himself and his colleagues.

65.     Unfortunately, but unsurprisingly, Fox News ignored Mr. Khan's complaints. Mr. Khan followed up with Ms. Collins on January 16, 2017, informing her that the use of foul and sexist language at the News Desk had worsened and that many of his coworkers found Mr.

Headen's recent use of the word "douchebag" to be extremely unprofessional and offensive. Again, Ms. Collins ignored Mr. Khan and failed to address his concerns.

66.     Mr. Khan followed up with Ms. Collins again on March 6, 2017. She finally responded the next day and assured him that his grievances had been reported and asked him to inform her if the inappropriate language and discriminatory comments continued.

67.     However, conditions in the Fox Newsroom did not improve. Mr. Khan emailed Ms. Collins again on April 11, 2017, and informed her that "if Mr. Headen had been spoken to about his language, it didn't do much good." Mr. Khan stressed that he wanted to resolve the matter "for once and for all." He even suggested that his own schedule be changed, so that he would not have to work alongside Mr. Headen and constantly be exposed to his excessive profanity and sexually offensive language. Fox completely ignored his request.

68.     In April of 2017, the New Executive Vice President of HR, Mr. Lord, disseminated an email about workplace concerns and included the name of an attorney, Ms. Michele Hirshman, to contact if an employee was experiencing problems at work. On April 14, 2017, Mr. Khan emailed Ms. Hirshman reiterating his concerns and she assured them that they would be addressed in a timely manner. Mr. Khan spoke with the Executive Vice President of HR, Mr. Kevin Lord, who assured him that Fox has a zero-tolerance policy for excessive profanity and that he would speak to Mr. Headen about his frequent use of foul and offensive language.

69.     On May 22, 2017, Mr. Headen referred to a colleague as a "fucker" and a "dick" and Mr. Khan informed Ms. Marsheila Hayes, the Director, Campus and Diversity Outreach on June 1, 2017, of this incident (along with other instances of excessive profanity at work). Ms. Hayes replied on June 2 assuring Mr. Khan that he "[does have] the right to work in an environment that is free of excessive profanity." She also promised that a company-wide memo would be

disseminated that specifically states that employees should "refrain from profanity and descriptors that refer to personal attributes such as race, color, national origin, gender, age, religion, sexual orientation, or disability." The memo also stated that "At work, certain comments, even if they are meant as a joke, could be perceived as harassment, so do not make such comments."

70.    Following the memo, conditions improved slightly—and temporarily—in the Newsroom. On March 15, 2019, Mr. Khan requested another meeting with Ms. Collins and Ms. Hayes. Again, instead of adequately addressing Mr. Khan's concerns, Ms. Collins and Ms. Hayes informed Mr. Khan that there was nothing they could do to improve the situation.

71.    On August 14, 2020, Mr. Khan contacted Mr. Lord to inform him that Ms. Hayes had directed Mr. Khan to stop raising the issue of profanity with his colleagues - despite the fact that Mr. Lord had previously suggested that Mr. Khan do just that. Mr. Khan notified Mr. Lord that offensive and sexist terms like "bitch," "cunt," "twat," etc., were used sometimes in the Newsroom. For instance, Mr. Headen described someone as a "son of a bitch" and referred to a female colleague as a "stupid cunt." After receiving no response from Mr. Lord, Mr. Khan followed up again on October 16 to complain and express concerns specifically about Mr. Headen.

72.    After receiving no response from Mr. Lord, Mr. Khan followed up again on October 16, 2020, to complain and express concerns specifically about Mr. Headen. He wrote that "My immediate supervisor Greg Headen unfortunately uses more profanity than anyone I know in the company, or anyone with whom I have ever worked. I know that he has been spoken to multiple times, but his language hasn't changed and probably never will." Mr. Khan, cognizant of Fox's reputation for retaliating against employees who file complaints against executives for hostile behavior, also wrote "I fear that the underlying tensions will eventually lead to more issues (including my complaints of retaliation) like we've had in the past." Mr. Khan asked Mr. Lord to

assign him to a different supervisor because he "just [could not] accept a manager who thinks that it's okay to use words like 'bitch' and 'cunt' to describe women he doesn't like." He added that he could not accept a manager who unapologetically uses words like "motherfucker," "cocksucker," "son of a bitch," and "douchebag" to describe people he doesn't like. Mr. Khan explained that he felt that such an individual had no credibility when it came to evaluating his job performance.

73.     After Mr. Khan sent the aforementioned email to Mr. Lord, he was contacted by the Head of Employee Relations, Ms. Anna Druker. Mr. Khan disclosed to Ms. Druker on November 17, 2020, that Mr. Headen had previously used offensive language describing Muslims and demonstrated hostility towards the Muslim community by associating all Muslims with terrorists. After conducting an investigation, Ms. Druker told Mr. Khan that Mr. Headen's offensive language was not objectionable or excessive and denied Mr. Khan's request for a new manager. When Mr. Khan informed Ms. Druker that Mr. Headen had stopped speaking to him after making his latest complaint, Ms. Druker offered Mr. Khan a severance package in lieu of properly addressing his complaints.

74.     In March of 2022, Ms. Denise Collins from HR reached out to Mr. Khan to ask him to meet with an attorney regarding an undergoing investigation into the News Department, and Mr. Headen in particular. Certain female employees had filed complaints about Mr. Headen and his treatment of women. Mr. Khan spoke with the attorney about Mr. Headen's previous inappropriate behavior towards women, including an incident where he berated a female coworker. The attorney also asked Mr. Khan if he had heard Mr. Headen use words like "douchebag" and "motherfucker" - and Mr. Khan confirmed that he had on numerous occasions. Mr. Khan also informed the attorney that Mr. Headen had not spoken to Mr. Khan in over a year. The attorney acknowledged that Mr. Headen's behavior was stressful for Mr. Khan.

75.     Rather than taking steps to remove or reassign Mr. Headen, or correct his offensive behavior, Fox News offered Mr. Khan a severance package to leave the company in March of 2022. Mr. Khan declined due to his passion for the job and respect for his new manager.

76.     In the months that followed, Mr. Khan made every attempt to mend his relationship with Mr. Headen. He never spoke negatively about Mr. Headen to any of his colleagues and treated Mr. Headen with respect and civility. However, this only made the situation worse. Mr. Headen seemingly resented Mr. Khan's attempts to establish peace between the two of them and expressed his anger towards Mr. Khan during their interactions. For example, although Mr. Headen supported workplace celebrations for special occasions such as birthdays for Mr. Khan's colleagues, he would not even acknowledge Mr. Khan's birthday even when other colleagues were doing so in his presence.  Not only did he continue to ignore Mr. Khan, but he became visibly angry and made faces at Mr. Khan every time he was in his presence. Mr. Headen also gave Mr. Khan dirty and threatening looks every time Mr. Khan greeted him in the hallways, the kitchen, or other common areas.

77.     Later that year on December 19, 2022, Mr. Khan again complained to HR about Mr. Headen's retaliatory behavior. After attending a workplace training course featuring guidance from Mr. Lachlan Murdoch that Fox is a place where everyone is treated with respect and dignity, Mr. Khan realized that Mr. Headen's behavior was not in line with Mr. Murdoch's directive. Mr. Khan called the Fox Alert Line and explained that Mr. Headen had created a retaliatory hostile work environment by his continued mistreatment of Mr. Khan. He also raised a concern that Mr. Headen was treating him in such a hostile manner because he was Muslim, given Mr. Headen's past discriminatory remarks towards Muslims.  For example, Mr. Headen would bring in hot bacon into the newsroom knowing that the smell bothered Mr. Khan as a Muslim who does not eat pork

and ignored Mr. Khan's request to step away to avoid the smell. Ms. Druker informed Mr. Khan that she would speak with Mr. Headen about Mr. Khan's concerns and assured him that Mr. Headen could not retaliate in response.

78.     In January of 2023, Ms. Druker contacted Mr. Khan to discuss her conversation with Mr. Headen regarding his inappropriate and retaliatory conduct. She informed Mr. Khan that an HR investigation concluded that Mr. Headen committed no policy violations. She excused his retaliatory behavior and did not address his anti-Muslim statements..

79.     On May 19, 2023, Mr. Khan was unjustly and unfairly terminated. Mr. Headen and Fox claimed that Mr. Khan's termination was due to restructuring but provided him no prior notice and made his termination effective immediately despite Mr. Khan's approximately fifteen years working for Fox. However, as detailed below, it is clear that Fox terminated Mr. Khan in retaliation for his complaints about Mr. Headen's conduct.

**V. Defendants Retaliate Against Mr. Khan for Reporting Mr. Headen's Discrimination**

80.     In July 2019, Mr. Khan received a satisfactory rating on his performance review by Mr. Headen in every category with the exception of "teamwork." Mr. Headen never raised any issues with any aspect of Mr. Khan's performance prior to his review. Mr. Headen failed to even bring up Mr. Khan's unsatisfactory rating in the area of teamwork, suggesting that he was trying to sneak it past Mr. Khan. Mr. Headen only addressed the matter when Mr. Khan noticed the unsatisfactory rating and questioned it.

81.     While at Fox News, Mr. Khan was unequivocally a team player. For example, on December 23, 2022, Mr. Khan volunteered to manage both the national and international news desks on Christmas Day when the person who was supposed to manage the national desk tested positive for COVID-19. Mr. Headen never thanked nor acknowledged Mr. Khan's willingness to

help out in this situation. Mr. Khan consistently and reliably volunteered to work undesirable shifts that other employees were unwilling to work, including permanent weekends, early morning shifts, and major holidays. He also demonstrated a willingness to be flexible with his schedule to accommodate others.

82.     When Mr. Khan questioned his unsatisfactory rating in "teamwork," Mr. Headen mentioned that the direction from superiors to avoid using profanity in the Newsroom was "all because of [Mr. Khan]" and he "was the only person who ever complained." Therefore,  it is clear Mr. Headen gave him an unsatisfactory rating in retaliation for reporting his conduct.

83.     On August 2, 2019, Mr. Khan emailed Ms. Collins to express his concerns about his performance evaluation. After Mr. Khan emailed Ms. Collins, Mr. Headen became angry and stopped speaking to Mr. Khan altogether. Mr. Khan's efforts to be respectful and civil with Mr. Headen were not reciprocated.

84.     Ms. Collins scheduled a meeting in September 2019 with herself, Mr. Headen, and Mr. Khan to discuss the performance review. During the meeting, Mr. Headen became extremely hostile. He yelled at Mr. Khan in a disrespectful manner and Ms. Collins had to end the meeting before the issue was resolved. When Ms. Collins suggested that they schedule another meeting, Mr. Headen refused. Mr. Khan was troubled and disconcerted following Mr. Headen's aggressive and hostile behavior.

85.     During this time, Mr. Khan's mother was very ill. Mr. Khan informed Mr. Headen of his mother's illness and Mr. Headen assured him that he would be accommodating. In October, Mr. Khan requested time off work to care for his sick mother in Missouri. He informed Mr. Headen ahead of time of his plans and Mr. Headen did not object.

86.     While Mr. Khan was in St. Louis to care for his mother, he received an email from Ms. Collins informing him that one of the days he took off had not been approved. When Mr. Khan called Mr. Headen to explain the situation, Mr. Headen refused to allow him to take a day off work to care for his mother following surgery, despite his previous tacit approval. Given Mr. Khan's stellar attendance record and the fact that he found a coworker to cover this shift, Mr. Headen's insistence that he return to work on this day instead of caring for his mother after surgery signaled a clear intent to retaliate.

87.     When Mr. Khan returned to work, he spoke with Ms. Collins and informed her that he was suspicious that Mr. Headen was acting in retaliation for reporting his inappropriate behavior. He also expressed that Mr. Headen was perhaps demonstrating anti-Muslim bias. Ms. Collins quickly dismissed Mr. Khan's concerns.

88.     In November 2020, Mr. Headen began to blatantly ignore Mr. Khan at work after he learned that Mr. Khan filed another complaint about his discriminatory language. On November 17, 2020, Mr. Khan disclosed to Ms. Druker that Mr. Headen had previously used offensive language describing Muslims and demonstrated hostility towards the Muslim community by associating all Muslims with terrorists.

89.     In April of 2021, Mr. Headen was promoted to Vice President of News Coverage. Mr. Headen continued to avoid speaking to Mr. Khan and treated him in a rude and unprofessional manner. For example, if Mr. Khan said "good morning" to Mr. Headen, Mr. Headen would blatantly ignore him. It was ironic that Mr. Headen would treat Mr. Khan this way, as he previously claimed that Mr. Khan was not proving himself to be a team player.

90.     Mr. Headen also retaliated against Mr. Khan by refusing to provide him with the opportunity for a promotion and instead promoting a less qualified employee with less years'

experience. With Mr. Headen's ascension to the position of Vice President of News Coverage, the role of Foreign Desk Manager became open. In May of 2021, Mr. Khan asked Mr. Headen about the vacancy, and how he might apply for it. As a 13-year veteran of the Fox News Foreign Desk and the only person in the unit with the title of "Senior Assignment Editor," Mr. Khan was the most logical choice for the position. However, Mr. Headen told Mr. Khan that he "didn't know" what was happening with the position, and never followed up with him about the job. He never even allowed Mr. Khan to apply for the position. In July of 2021, Mr. Headen announced that Mr. Headen had given the job to a freelance assignment editor who was far less qualified and had far less experience at Fox News than Mr. Khan.

91.     In March of 2022, Ms. Denise Collins from HR reached out to Mr. Khan to ask him to meet with an attorney regarding an undergoing investigation into the News Department, and Mr. Headen in particular. Numerous female employees had filed complaints about Mr. Headen and his treatment of women. Mr. Khan spoke with the attorney about Mr. Headen's previous inappropriate behavior towards women, including an incident where he berated a female coworker.

92.     Mr. Headen continued to avoid communicating with Mr. Khan. He projected anger in Mr. Khan's presence and created an uncomfortable and retaliatory hostile work environment. Mr. Khan made every attempt to mend his relationship with Mr. Headen. He never spoke negatively about Mr. Headen to any of his colleagues and made attempts to greet Mr. Headen and show him respect and civility. However, this only made the situation worse. Mr. Headen seemed to become angry at Mr. Khan's attempts to establish peace between the two of them. For example, although Mr. Headen supported workplace celebrations for special occasions such as birthdays for Mr. Khan's colleagues, he would not even acknowledge Mr. Khan's birthday even when other colleagues were doing so in his presence.  Not only did he continue to ignore Mr. Khan, but he

became visibly angry and made faces every time Mr. Khan was in his presence. He also gave Mr. Khan dirty and threatening looks every time Mr. Khan greeted him in the hallways, the kitchen, or other common areas.

93.     On December 19, 2022, Mr. Khan called the Fox Alert Line and made what would be his final complaint about the retaliatory hostile work environment that Mr. Headen had created. After attending a workplace training course which included Mr. Murdoch's call for respect and dignity in the Fox workplace, Mr. Khan explained on the Alert Line that Mr. Headen was treating him in the most horrible manner. He also raised a concern that Mr. Headen was treating him in such a hostile manner because he was Muslim, given Mr. Headen's past discriminatory remarks towards Muslims. For example, Mr. Headen would bring in hot bacon into the newsroom knowing that the smell bothered Mr. Khan as a Muslim who does not eat pork and ignored Mr. Khan's request to step away to avoid the smell. Ms. Druker informed Mr. Khan that she would speak with Mr. Headen about Mr. Khan's concerns and assured him that Mr. Headen would not retaliate in response.

94.     In January of 2023, Ms. Druker contacted Mr. Khan to discuss her conversation with Mr. Headen regarding his inappropriate and retaliatory conduct. She informed Mr. Khan that an HR investigation concluded that Mr. Headen committed no policy violations. Essentially, Ms. Druker told Mr. Khan that Mr. Headen was not deliberately ignoring him but instead was a high-level executive without time for "chit-chat." Although Mr. Khan was tempted to leave the company after this call, he chose to stay due to his passion for the job.

95.     After Ms. Druker informed Mr. Khan that Fox had concluded that Mr. Headen committed no policy violations, Mr. Headen continued his retaliatory behavior against Mr. Khan by ignoring him at work and giving him angry and threatening looks anytime they saw each other.

96.     On May 19, 2023, Mr. Khan was unjustly and unfairly terminated. Mr. Headen and Fox claimed that Mr. Khan's termination was due to restructuring but provided him no prior notice and made his termination effective immediately despite Mr. Khan's approximately fifteen years working for Fox.

97.     Upon information and belief, Fox had not conducted a restructuring of the assignment desk which led to terminations in approximately twenty-seven years.

98.     Mr. Khan was terminated along with a recent hire who failed to meet performance expectations and who had worked for Fox less than a year. Fox did not provide Mr. Khan with an option to continue to work on a freelance basis nor make any effort to allow him to apply for other positions at the company. Of the thirty-three individuals working for Fox at the assignment desk, seven were freelance workers who were not terminated as part of the "restructuring."

99.     By terminating Mr. Khan in this unjustified manner, Fox News sent a clear message to victims of discrimination and harassment – *speak out and you are out.*

100.     Accordingly, as set forth above, Defendants have unlawfully subjected Mr. Khan to retaliation. As a result, Mr. Khan has been significantly damaged – economically, emotionally, and reputationally – and is forced to bring the instant action seeking redress from Defendants and to put an end to the discriminatory and retaliatory hostile work environment he and other Fox News employees have had to endure for far too long.

## FIRST CAUSE OF ACTION
**Retaliation in Violation of Title VII of the Federal 1964 Civil Rights Act,**
**42 U.S.C. § 2000e *et seq*.**
*(Against Entity Defendants)*

101.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully and completely stated herein.

102.     Title VII stipulates that it is an unlawful employment practice for an employer to "discriminate against any of his employees…because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

103.     To demonstrate a prima facie case of retaliation, a plaintiff must establish: "(1) that he participated in an activity protected by Title VII, (2) that his participation was known to his employer, (3) that his employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). The Plaintiff's burden of proof at the prima facie stage is "de minimis." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

107.     Defendants retaliated against Plaintiff in violation of Title VII by failing to provide him an opportunity to apply for a promotion, providing him with a baseless negative performance evaluation, forcing him to cancel pre-approved time off to visit his ill mother, subjecting him to a hostile work environment, and by ultimately terminating him.

108.     Protected activity is a formal or informal complaint about employment practices or conditions that is motivated by a "good faith, reasonable belief that the underlying employment practice was unlawful," even if the practices or conditions were not actually unlawful. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2000).

109.     Plaintiff participated in a "protected activity" by filing a number of complaints against Individual Defendant for sexist, homophobic, and Islamophobic rhetoric. Moreover, in March of 2022, he assisted corporate counsel with an investigation into allegations of gender

discrimination by Individual Defendant.

110.   Defendants were aware of Plaintiff's numerous complaints about Individual Defendant's conduct.

111.   Despite Plaintiff's efforts to foster a civil work environment, Individual Defendant treated him with disdain and subjected him to a hostile work environment after Plaintiff made complaints about Individual Defendant's inappropriate and discriminatory conduct. When Plaintiff questioned his unsatisfactory performance rating, Individual Defendant mentioned that the direction from superiors to avoid using profanity in the Newsroom was "all because of [Mr. Khan]" and he "was the only person who ever complained," demonstrating retaliatory animus.

112.   Individual Defendant also retaliated against Plaintiff by refusing to provide him with the opportunity for a promotion and instead promoting a less qualified employee with less years' experience. This occurred a few months after Plaintiff disclosed that Individual Defendant had previously used offensive language describing women and Muslims and demonstrated hostility towards the Muslim community.

104.   Finally, a few months after Plaintiff contacted the HR Alert line and informed them about Individual Defendant's offensive and harassing behavior and spoke with Ms. Druker about his concerns, he was unjustly and unfairly terminated.

105.   For all the foregoing reasons, Entity Defendants have engaged in the unlawful employment practice of subjecting Mr. Khan to retaliation in violation of Title VII.

106.   As a direct and proximate result of the discriminatory and abusive conduct of Defendants, Plaintiff suffered adverse employment consequences by the conduct of their employees and managers, including loss of wages, professional opportunities, and other valuable benefits and emoluments of employment, as well as severe mental, physical, and emotional stress,

pain and suffering, anxiety, stress, humiliation, loss of enjoyment of life, and damage to his reputation.

107.    Defendants' conduct was willful and motivated by malice and/or reckless indifference to Plaintiff's legal rights, entitling him to an award of punitive damages.

<u>**SECOND CAUSE OF ACTION**</u>
**Retaliation in Violation of the New York City Human Rights Law,**
**N.Y. Administrative Code § 8-107**
*(Against Individual Defendant)*

108.    Plaintiff repeats and re-alleges the allegations contained in all the preceding paragraphs of this Amended Complaint as if set forth herein at length.

109.    New York City Administrative Code Section 8-107(7) provides that: it is "an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (1) opposed any practice forbidden under this chapter; or (2) filed a complaint, testified or assisted in any proceeding under this chapter; or (3) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter; or (4) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title; or (5) requested a reasonable accommodation under this chapter."

110.    To establish a prima facie retaliation claim, a Plaintiff must plausibly allege that: (1) he suffered a "materially adverse" employment action; (2) the employer was aware of this activity; (3) he participated in a "protected activity"; and (4) the adverse employment action is "causally connected" to his participation in the protected activity. *Littlejohn v. City of New York*, 795 F.3d at 315.

111.    NYCHRL employs a broader standard of an "adverse employment action" than its federal and state counterparts.

112.    Individual Defendant retaliated against Plaintiff in violation of the NYCHRL by failing to provide him an opportunity to apply for a promotion, providing him with a baseless negative performance evaluation, forcing him to cancel pre-approved time off to visit his ill mother, subjecting him to a hostile work environment, and by ultimately terminating him.

113.    Protected activity is a formal or informal complaint about employment practices or conditions that is motivated by a "good faith, reasonable belief that the underlying employment practice was unlawful," even if the practices or conditions were not actually unlawful. *Treglia v. Town of Manlius*, 313 F.3d at 719.

114.    Plaintiff participated in a "protected activity" by filing a number of complaints against Individual Defendant for sexist, homophobic, and Islamophobic rhetoric. Moreover, in March of 2022, he assisted corporate counsel with an investigation into allegations of gender discrimination by Individual Defendant.

115.    Individual Defendant was aware of Plaintiff's numerous complaints about Individual Defendant's conduct.

116.    To adequately plead causation, Plaintiff must plausibly allege that his protected activity was a "but-for" cause of the employer's adverse employment action. Causation may be shown by direct evidence of retaliatory animus or inferred through temporal proximity to the protected activity.

117.    Despite Plaintiff's efforts to foster a civil work environment, Individual Defendant treated him with disdain and subjected him to a hostile work environment after Plaintiff made complaints about Individual Defendant's inappropriate and discriminatory conduct. When Plaintiff questioned his unsatisfactory performance rating, Individual Defendant mentioned that the direction from superiors to avoid using profanity in the Newsroom was "all because of [Mr. Khan]"

and he "was the only person who ever complained," demonstrating retaliatory animus.

118.    Individual Defendant also retaliated against Plaintiff by refusing to provide him with the opportunity for a promotion and instead promoting a less qualified employee with less years' experience. This occurred a few months after Plaintiff disclosed that Individual Defendant had previously used offensive language describing Muslims and demonstrated hostility towards the Muslim community.

119.    Finally, a few months after Plaintiff contacted the Fox HR Alert line and informed them about Individual Defendant's continuously discriminatory and retaliatory behavior and spoke with Ms. Druker about his concerns, he was unjustly and unfairly terminated.

120.    As a direct and proximate result of Defendant's unlawful conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

121.    Individual Defendant's unlawful actions constitute malicious, willful, and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
**Aiding and Abetting Unlawful Discrimination in Violation of the New York City Human Rights Law, N.Y. Administrative Code § 8-107**
*(Against Entity Defendants)*

122.    Plaintiff repeats and re-alleges the allegations contained in all the preceding paragraphs of this Amended Complaint as if set forth herein at length.

123.    New York City Administrative Code Section 8-107(6) provides that: it is "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."

124.    By the actions described above, among others, Entity Defendants knowingly or recklessly aided and abetted and directly participated in the unlawful retaliation to which Plaintiff

was subjected in violation of the NYCHRL.

125.     As a direct and proximate result of Entity Defendants' unlawful conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

126.     Entity Defendants' unlawful actions constitute malicious, willful, and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**Retaliation in Violation of the New York City Human Rights Law,**
**N.Y. Administrative Code § 8-107**
*(Against Entity Defendants)*

127.     Plaintiff repeats and re-alleges the allegations contained in all the preceding paragraphs of this Amended Complaint as if set forth herein at length.

128.     New York City Administrative Code Section 8-107(7) provides that: it is "an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (1) opposed any practice forbidden under this chapter; or (2) filed a complaint, testified or assisted in any proceeding under this chapter; or (3) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter; or (4) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title; or (5) requested a reasonable accommodation under this chapter."

129.     To establish a prima facie retaliation claim, a Plaintiff must plausibly allege that: (1) he suffered a "materially adverse" employment action; (2) the employer was aware of this activity; (3) he participated in a "protected activity"; and (4) the adverse employment action is "causally connected" to his participation in the protected activity. *Littlejohn v. City of New York*,

35

795 F.3d at 315.

130.   NYCHRL employs a broader standard of an "adverse employment action" than its federal and state counterparts.

131.   Entity Defendants retaliated against Plaintiff in violation of the NYCHRL by failing to provide him an opportunity to apply for a promotion, providing him with a baseless negative performance evaluation, forcing him to cancel pre-approved time off to visit his ill mother, subjecting him to a hostile work environment, and by ultimately terminating him.

132.   Protected activity is a formal or informal complaint about employment practices or conditions that is motivated by a "good faith, reasonable belief that the underlying employment practice was unlawful," even if the practices or conditions were not actually unlawful. *Treglia v. Town of Manlius*, 313 F.3d at 719.

133.   Plaintiff participated in a "protected activity" by filing a number of complaints against Individual Defendant for sexist, homophobic, and Islamophobic rhetoric. Moreover, in March of 2022, he assisted corporate counsel with an investigation into allegations of gender discrimination by Individual Defendant.

134.   Entity Defendants were aware of Plaintiff's numerous complaints about Individual Defendant's conduct.

135.   To adequately plead causation, Plaintiff must plausibly allege that his protected activity was a "but-for" cause of the employer's adverse employment action. Causation may be shown by direct evidence of retaliatory animus or inferred through temporal proximity to the protected activity.

136.   Despite Plaintiff's efforts to foster a civil work environment, Individual Defendant treated him with disdain and subjected him to a hostile work environment after Plaintiff made

complaints about Individual Defendant's inappropriate and discriminatory conduct. When Plaintiff questioned his unsatisfactory performance rating, Individual Defendant mentioned that the direction from superiors to avoid using profanity in the Newsroom was "all because of [Mr. Khan]" and he "was the only person who ever complained," demonstrating retaliatory animus.

137.    Entity Defendants also retaliated against Plaintiff by refusing to provide him with the opportunity for a promotion and instead promoting a less qualified employee with less years' experience. This occurred a few months after Plaintiff disclosed that Individual Defendant had previously used offensive language describing women and Muslims and demonstrated hostility towards the Muslim community.

138.    Finally, a few months after Plaintiff contacted the Fox HR Alert line and informed them about Individual Defendant's continuously discriminatory and retaliatory behavior and spoke with Ms. Druker about his concerns, he was unjustly and unfairly terminated.

139.    As a direct and proximate result of Defendant's unlawful conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

140.    Individual Defendant's unlawful actions constitute malicious, willful, and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands judgment in his favor against Defendants as follows:

A.    Declaring that Defendants have engaged in, and enjoining Defendants from continuing to engage in, unlawful employment practices prohibited by federal and New York City Law;

B.      Awarding Plaintiff compensatory damages for all back and future loss of wages, lost income, benefits, retirement losses, stock benefits losses, pain, suffering, stress, humiliation, mental anguish, and emotional harm, as well as damage to his reputation, damage to career path, and loss of income stemming therefrom;

C.      Awarding Plaintiff liquidated damages;

D.      Awarding Plaintiff treble damages;

E.      Awarding Plaintiff punitive damages;

F.      Awarding Plaintiff attorneys' fees and expert/consultant fees;

G.      Awarding Plaintiff pre- and post-judgment interest;

H.      Awarding Plaintiff reimbursement for the negative tax consequences of a judgment;

I.      Awarding Plaintiff costs of suit and attorneys' fees; and

J.      Awarding Plaintiff such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury with respect to all issues properly triable by jury.

Dated: January 8, 2024

New York, New York                                  Respectfully submitted,

                                                    **THE OTTINGER FIRM, P.C.**

                                                    Robert Ottinger
                                                    79 Madison Avenue
                                                    New York, New York 10016
                                                    Telephone: (347) 492-1904
                                                    robert@ottingerlaw.com

                                                    *Attorneys for Plaintiff Tariq Khan*